# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | |
|---|---|
| **MARC KAPSALIS and ZIKAP, INC,** ) | |
| ) | |
| **Plaintiff**, ) | |
| ) | |
| v. ) | Case No.: 2:19-cv-00744-RDP |
| ) | |
| **DR. DEAN SICKING and SICKING** ) | |
| **SAFETY SYSTEMS, INC.,** ) | |
| ) | |
| **Defendants**. ) | |

## ANSWER AND COUNTERCLAIM

Defendants Dr. Dean Sicking and Sicking Safety Systems, Inc. file this answer to the Complaint filed by Marc Kapsalis and ZiKap, Inc.

### Count I (Fraud/Sicking)

1. Defendants deny any existence of a cause of action. Defendants lack sufficient information and/or knowledge to admit or deny the remaining allegations in this paragraph.

2. Defendants lack sufficient information and/or knowledge to admit or deny the allegations in this paragraph.

3. Admitted.

4. Defendants admit that ZIKAP is an Illinois corporation. Defendants lack sufficient information and/or knowledge to admit or deny the remaining allegations in this paragraph.

5. Admitted.

6. Admitted.

7. Defendants admit the allegations in this paragraph to the extent that an inactive corporation can exist under the laws of the State of Nebraska and can have officers, directors, and agents, but otherwise deny the allegations of this paragraph.

8. Admitted.

9. Admitted.

10. Admitted.

11. Admitted.

12. Admitted.

13. Defendants lack sufficient information and/or knowledge to admit or deny the allegations in this paragraph, and therefore, deny the same.

14. Defendants admit that the parties were operating on an oral agreement. Defendants deny that Sicking estimated that the cost range would be $10,000-$20,000 for the entire project. Defendants admit that Sicking would design and develop the intellectual property and conduct testing.

15. Defendants admit that Sicking signed Exhibit A to the Complaint but otherwise deny the allegations of this paragraph.

16. Exhibit A to the Complaint speaks for itself. Defendants otherwise deny the allegations of paragraph 16.

17. Denied. Exhibit A to the Complaint speaks for itself.

18. Defendants deny the first sentence of paragraph 18. Defendants lack the sufficient information and/or knowledge to admit or deny the second sentence. Defendants deny the third sentence.

19. Paragraph 19 is a statement of opinion that Defendants lack the sufficient information and/or knowledge to admit or deny, and therefore, deny the same.

20. Denied.

21. Admitted.

22. Denied.

23. Denied.

24. Denied.

25. Denied.

26. Denied.

27. Denied.

28. Denied.

29. Denied.

30. Denied.

Defendants deny that Plaintiffs are due the relief sought in their ad damnum clause.

## Count II (Breach of Contract/Sicking)

31. Defendants incorporate by reference their responses to paragraphs 1–30.

32. Defendants admit that Sicking signed Exhibit A to the Complaint but otherwise deny this paragraph.

33. Exhibit A to the Complaint speaks for itself. Defendants otherwise deny the allegations in paragraph 33.

34. Denied.

35. Denied.

36. Denied.

37. Denied.

Defendants deny that Plaintiffs are due the relief sought in their ad damnum clause.

### Count III (Respondeat Superior/SSS)

38. Defendant incorporates by reference their responses to paragraphs 1–38.

39. Denied.

Defendants deny that Plaintiffs are due the relief sought in their ad damnum clause.

### **AFFIRMATIVE DEFENSES**

1. Plaintiffs' claims are barred because the Complaint fails to state a claim upon which relief can be granted.

2. Plaintiffs' claims are barred because the Complaint fails to plead fraud with the required particularity.

3. Plaintiffs' fraud claims are barred because the parties entered into a binding contract governing the issue.

4. Plaintiffs' claims are barred by lack of consideration.

5. Plaintiffs' claims are barred by acquiescence.

6. Plaintiffs' claims are barred because the contract is unenforceable.

7. Plaintiffs' claims are barred because the parties never had a meeting of the minds.

8. Plaintiffs have failed to mitigate their damages.

9. Plaintiffs' claims are barred because they breached the contract.

10. Plaintiffs' claims are barred because they breached the duty of good faith and fair dealing.

11. Plaintiffs' claims are barred because if Plaintiffs' suffered damages, such damages were caused, in whole or in part, by their own acts or omissions.

12. While Defendants deny that they are liable for any conduct that would support an award of punitive damages, Defendants plead the legislative cap on punitive damages contained in Ala. Code § 6-11-21.

13. Defendants plead that Plaintiffs' claims are subject to the limitations and protections of Ala. Code § 6-11-27.

14. Plaintiffs' demand for punitive damages violates the excessive fines provision, due process clauses, and equal protection clauses of both the United States Constitution and the Alabama Constitution.

15. Any award of punitive damages to Plaintiffs in this case would be violative of the constitutional safeguards provided to Defendants under the Constitution of the United States of America, including, but not limited to, the Fourth, Fifth, Sixth, Eight, and Fourteenth Amendments to the Constitution of the United States. With respect to Plaintiffs' demands herein for punitive damages, such demands are limited by and subject to any and all standards or limitations regarding the determination and/or enforceability of punitive damages awards articulated in *BMW of North America, Inc. v. Gore*, 116 S.Ct. 1589 (1996); *Cooper Industries, Inc. v. Leatherman Tool Group, Inc.*, 121 S.Ct. 1678 (2001) and *State Farm Mut. Auto. Ins. Co. v. Campbell*, 123 S.Ct. 1513 (2003).

16. Plaintiffs' claims are barred, in whole or in part, by waiver.

17. Plaintiffs' claims are barred, in whole or in part, by estoppel.

18. Plaintiffs' claims are barred, in whole or in part, by laches.

19. Plaintiffs' claims are barred, in whole or in part, by unclean hands.

20. Plaintiffs' claims are barred, in whole or in part, by the terms of the applicable contract(s).

21. Plaintiffs' claims are barred, in whole or in part, by failure to satisfy a condition precedent.

22. Plaintiffs' claims are barred, in whole or in part, by accord and satisfaction.

23. Plaintiffs' claims are barred, in whole or in part, by duress.

24. Plaintiffs' claims are barred, in whole or in part, because the contract is impermissibly vague.

25. Plaintiffs' claims are barred, in whole or in part, by release.

26. Plaintiffs' claims are barred, in whole or in part, by statute of frauds.

27. Plaintiffs' claims are barred, in whole or in part, by statute of limitations.

28. Plaintiffs' claims are barred, in whole or in part, because the parties modified the contract.

## COUNTERCLAIM

Defendant/Counterclaim Plaintiff Dean Sicking asserts the following counterclaims against Marc Kapsalis.

## PARTIES

1. Defendant/Counterclaim Plaintiff Dean Sicking is a resident of Alabama.

2. Plaintiff/Counterclaim Defendant Marc Kapsalis is a resident of Illinois.

## JURISDICTION

3. This Court has jurisdiction over this counterclaim under 28 U.S.C. § 1332 because complete diversity exists between the parties and the amount in controversy exceeds $75,000.

4. This Court also has jurisdiction over this counterclaim under 28 U.S.C. § 1367.

5.      The claims asserted in the Complaint by Kapsalis and ZiKap stem from the business venture to develop certain hockey safety products. Similarly, the claims in this Counterclaim stem from this business venture and other allegations in the Complaint.

6.      Accordingly, the claims in the Complaint and the Counterclaim share a common nucleus of operative facts.

## FACTS

7.      Dr. Dean Sicking is a renowned expert in safety product development, impact energy management, human tolerance for impact, and computational mechanics.

8.      Dr. Sicking holds a Masters in Science and Ph.D. in Civil Engineering.

9.      Dr. Sicking's work in these fields has led to the development of innovative products, including the SAFER Barrier used in NASCAR and other racing circuits and life-saving guardrail systems.

10.     In recognition of his innovative and life-saving work, President George W. Bush awarded Dr. Sicking the National Medal of Technology and Innovation.

11.     In 2012, Marc Kapsalis contacted Dr. Sicking to discuss the development of safer hockey equipment.

12.     Dr. Sicking and Kapsalis had no relationship prior to Kapsalis reaching out to Dr. Sicking.

13.     Kapsalis visited Dr. Sicking in Nebraska—where Sicking then lived—to discuss the potential hockey project, and after this meeting, they decided to jointly pursue the development of a safer hockey dasher, or wall.

14. While Kapsalis has experience in hockey, he does not have the ability to research, design, and develop the dashers. Kapsalis has no experience in developing a product, obtaining the necessary patents, and taking it to market.

15. This lack of experience means that Kapsalis does not appreciate the nature and process of developing a product like the dashers—which takes substantial research, adequate funding, multiple rounds of testing, and evaluation of data from testing.

16. Prior to contacting Dr. Sicking, Kapsalis worked with Rensselaer Polytechnic Institute on this project, but that work showed no appreciable results.

17. Dr. Sicking and Kapsalis agreed to share the costs of this project equally—with each paying 50% of the costs.

18. Dr. Sicking and Kapsalis agreed that after Dr. Sicking developed a marketable product that met the necessary benchmarks in testing, Dr. Sicking and Kapsalis would license the product to third party licensees. The licensees would then manufacture and sell the product while paying royalties to Kapsalis and Dr. Sicking.

19. Dr. Sicking and Kapsalis also discussed developing a safer hockey helmet to reduce injuries.

20. Dr. Sicking informed Kapsalis that developing a hockey helmet would require approximately $1,000,000 in funding and that Dr. Sicking could not start serious efforts to design, develop, and test a helmet until Kapsalis came up with his half of the funding.

21. Kapsalis did not acquire $500,000 in funding, though, and as a result, Dr. Sicking has not had the resources necessary to develop a safer hockey helmet.

22. Dr. Sicking has conducted a significant amount of research for this project at considerable expense and created multiple designs with various materials.

23. Dr. Sicking has also conducted at least six rounds of testing, and while this testing has shown considerable progress, Dr. Sicking has not reached the point of developing a product that can be feasibly licensed and marketed.

24. Dr. Sicking has more testing of an improved design scheduled in the immediate future.

25. Dr. Sicking has hired student workers to help with the research, design, data collection, and data evaluation.

26. Aside from attending some testing and suggesting unworkable ideas, Kapsalis has not appreciably contributed to any of the research, development, and testing.

27. To date, Dr. Sicking has incurred the vast majority of expenses associated with this project.

28. Dr. Sicking has incurred over $175,000 in expenses on this project and is continuing to incur more as the project proceeds.

29. Kapsalis has incurred very few legitimate costs in furtherance of this project. Dr. Sicking estimates that Kapsalis has incurred approximately $10,000 in legitimate expenses—far less than the promised 50% burden Kapsalis was supposed to bear.

30. Kapsalis has, at times, claimed that he was due a salary for work on his project. However, Sicking never agreed to treat a salary for Kapsalis as an expense of the joint venture.

31. Sicking himself—who is by far the most important person in the joint venture because of his technical expertise and proven track record—did not consider providing himself a "salary" based on his work on the project.

32. Kapsalis touted to Dr. Sicking and others that he had various investors in the project—presumably investors in ZiKap. However, despite these investors, Kapsalis never paid for his share of the expenses on the project.

33. Dr. Sicking paid all of the expenses he incurred for this project, while Kapsalis incurred very few expenses.

34. Because of Kapsalis's unfamiliarity with developing a safety product, he has demanded unreasonable timelines and commitments from Dr. Sicking.

35. Kapsalis believes that Dr. Sicking should have developed and licensed a marketable product by now, but he ignores the realities of the project—including the lack of funding, testing logistics, problems with materials, and time commitments.

36. Kapsalis's impatience has led him to demand money from Dr. Sicking. At various times, Dr. Sicking purchased ZiKap stock from Kapsalis—although Kapsalis has never transferred any stock certificates to Dr. Sicking or otherwise treated Dr. Sicking as a shareholder of ZiKap.

37. In total, Dr. Sicking has paid Kapsalis over $100,000 to purchase ZiKap stock from Kapsalis.

38. Despite the stock purchases, Kapsalis still complained to Sicking about not having money and attempting to blame Dr. Sicking for his lack money.

39. Because (1) this project has not yet produced income and (2) Kapsalis has apparently spent all the money paid by Dr. Sicking for ZiKap stock that Kapsalis has never transferred, Kapsalis requested a personal loan from Dr. Sicking while the two were in Detroit for testing of the hockey wall system.

40. Dr. Sicking agreed to loan Kapsalis $36,000 in six monthly installments of $6,000—with the first monthly loan installment occurring in January 2018.

41. Kapsalis told Dr. Sicking in January 2018 that he expected to receive $40,000 as an inheritance from an estate of a family member. Kapsalis expected to receive this $40,000 within six months.

42. Therefore, Dr. Sicking and Kapsalis agreed that Kapsalis would repay the $36,000 loan to Dr. Sicking approximately seven months after the first $6,000 installment and within four weeks the final monthly installment.

43. Dr. Sicking made all six monthly installments of $6,000 to Kapsalis.

44. Kapsalis has never repaid Dr. Sicking in violation of their loan agreement.

### COUNT I (BREACH OF CONTRACT—PROJECT EXPENSES)

45. Dr. Sicking repeats and reavers the foregoing paragraphs as if fully set forth herein.

46. Kapsalis and Dr. Sicking entered into an agreement under which the two would share the expenses of a joint venture aimed at developing safer hockey dashers.

47. Sicking has incurred over $175,000 in legitimate expenses as part of the joint venture including (1) paying student workers to help with the project, (2) paying rental fees for a lab in Birmingham, (3) paying travel expenses to and from testing; and (4) purchasing of materials for developing the walls.

48. Kapsalis, on the other hand, has incurred very few legitimate expenses. Dr. Sicking estimates that he has incurred approximately $10,000.

49. Kapsalis has never reimbursed Sicking for the significant expenses Dr. Sicking incurred and has not funded 50% of the project expenses as agreed.

50. Kapsalis is therefore in breach of the agreement to split all expenses evenly, and as a result, Dr. Sicking has been damaged because he has incurred a disproportionate share of the expenses.

WHEREFORE, Dr. Sicking demands judgment against Kapsalis for compensatory damages in an amount to be determined by the Court plus interest, attorney's fees, and costs.

### COUNT II (BREACH OF CONTRACT—PERSONAL LOAN)

51. Dr. Sicking repeats and reavers the foregoing paragraphs as if fully set forth herein.

52. Dr. Sicking and Kapsalis entered into an oral agreement that Dr. Sicking would loan Kapsalis $36,000 in six equal installments beginning in January 2018.

53. Kapsalis informed Dr. Sicking that he was set to receive $40,000 from the estate of a family member that he could repay Dr. Sicking shortly after he received that money in approximately six months.

54. Therefore, Dr. Sicking and Kapsalis agreed that Kapsalis would repay Dr. Sicking within seven months from the first monthly loan installment.

55. Dr. Sicking made all six monthly installments to Kapsalis totaling $36,000.

56. The seventh month repayment deadline (approximately July 2018) has since passed.

57. Kapsalis has not repaid Dr. Sicking and is therefore in breach of the loan agreement.

58. Dr. Sicking has been damaged because he has not received the promised repayment from Kapsalis.

WHEREFORE, Dr. Sicking demands judgment against Kapsalis for compensatory damages in an amount to be determined by the Court plus interest, attorney's fees, and costs.

### COUNT III (DECLARATORY JUDGMENT)

59. Dr. Sicking repeats and reavers the foregoing paragraphs as if fully set forth herein.

60. Dr. Sicking and Kapsalis entered into a joint venture agreement to pursue the development of a safer hockey dasher system.

61. Dr. Sicking and Kapsalis agreed to split the costs of the project evenly, with each paying 50%.

62. Dr. Sicking and Kapsalis never agreed to pay Kapsalis a salary as an expense of the joint venture.

63. In fact, a salary would not make sense, as it would simply amount to Sicking paying Kapsalis 50% of the "salary" and Kapsalis paying himself the other half.

64. However, Kapsalis has insisted at times that he is owed money as a "salary." Presumably, Kapsalis is seeking damages in this case related to this illusory salary.

65. Prospective declaratory relief is necessary to determine the future rights and obligations of Dr. Sicking and Kapsalis.

66. Sicking requests a declaratory judgment that Kapsalis must pay 50% of all expenses incurred to date and 50% of all expenses incurred in the future related to the hockey dasher project.

67. Sicking also requests a declaratory judgment that the parties' joint venture did not include paying Kapsalis a salary and that Kapsalis is not due a salary under the agreement.

WHEREFORE, Dr. Sicking demands a declaratory judgment entered by the Court providing for the above-stated relief and any other relief the Court deems necessary.

## COUNT IV (UNJUST ENRICHMENT—PROJECT EXPENSES)

68. Dr. Sicking repeats and reavers the foregoing paragraphs as if fully set forth herein.

69. Dr. Sicking and Kapsalis have worked together to develop a safer hockey dasher system.

70. Dr. Sicking has spent over $175,000 of his own money to fund the research, development, and testing of the hockey dasher system he designed.

71. Kapsalis has only spent approximately $10,000-$20,000 of his own money in pursuit of the hockey dasher system.

72. As joint-venture partners, Dr. Sicking and Kapsalis were to share equally in the expenses and profits of the project.

73. Kapsalis has knowingly accepted and retained a benefit by failing to bear half of the costs and expenses of the hockey dasher project.

74. Instead of paying 50% of the expenses, Kapsalis has paid approximately 10% of the expenses.

75. Dr. Sicking has, however, paid approximately 90% of the expenses of the project.

76. Kapsalis has been unjustly enriched by having Dr. Sicking fund roughly 90% of the expenses of the project when the expense burden should have been shared evenly.

77. Dr. Sicking had a reasonable expectation that Kapsalis would pay for half of the expenses, as the two had originally contemplated.

78. In equity and good conscience and based on his earlier representations that he would fund 50% of the project expenses, Kapsalis should be required to reimburse Dr. Sicking for all expenses exceeding 50% of the total incurred in the project.

79.

WHEREFORE, Dr. Sicking demands judgment against Kapsalis for an amount equal to the expenses of the project paid by Dr. Sicking in excess of 50% of the total plus interest, attorney's fees, and costs.

## COUNT V (UNJUST ENRICHMENT—PERSONAL LOAN)

80. Dr. Sicking repeats and reavers the foregoing paragraphs as if fully set forth herein.

81. Dr. Sicking loaned Kapsalis $36,000 in six $6,000 monthly installments beginning in January 2018.

82. Kapsalis accepted and retained all of this money.

83. Kapsalis represented that he would repay Dr. Sicking because Kapsalis was set to receive $40,000 from the estate of a family member, and Dr. Sicking expected that Kapsalis would, in fact, repay him.

84. Kapsalis has never repaid Sicking.

85. Kapsalis has been unjustly enriched in the amount of $36,000.  In equity and good conscience and based on Kapsalis's representations that he would repay Dr. Sicking, Dr. Sicking should be required to reimburse Dr. Sicking for the full amount of the $36,000 loan.

WHEREFORE, Dr. Sicking demands judgment against Kapsalis for $36,000 plus interest, attorney's fees, and costs.

                                                 /s/  Brannon J. Buck
                                                Brannon J. Buck (ASB-5848-K56B)
                                                bbuck@badhambuck.com
                                                Christopher B. Driver (ASB-9148-G39B)
                                                cdriver@badhambuck.com
                                                *Counsel for Defendants Dr. Dean Sicking and Sicking Safety Systems, Inc.*

OF COUNSEL:
BADHAM & BUCK, LLC
2001 Park Place North, Suite 500
Birmingham, Alabama 35203
Phone: (205) 521-0036
Fax: (205) 521-0037

## **CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing was served on the following via the CM/ECF electronic filing system, electronic mail and/or U.S. Mail on the 29th day of May, 2019:

Donald John Angelini, Jr.
ANGELINI & ORI, LLC
155 N. Michigan Ave., Suite 400
Chicago, Illinois 60601
dangelini@angeliniorilaw.com

                                                       */s/  Brannon J. Buck*
                                                     OF COUNSEL